**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

IN RE: DICAMBA HERBICIDES     )          MDL No. 2820
LITIGATION                   )

## <u>MEMORANDUM and ORDER</u>

Factual Background ........................................................................................... 2

Legal Standard ................................................................................................... 4

The Motions to Dismiss ..................................................................................... 5

I.    Failure to plead Monsanto product caused plaintiffs' injuries ............................ 5
II.   Lanham Act ............................................................................................... 7
     A.    "Zone of interest" .................................................................. 8
     B.    Lack of standing for 2016 claims ........................................... 9
     C.    Proximate cause .................................................................. 10
     D.    Personal jurisdiction ............................................................ 11
          1.  Monsanto .................................................................. 12
          2.  BASF ....................................................................... 12
III.  Arkansas Plaintiffs' Counts 2-13 ............................................................. 14
IV.  Ultrahazardous Activity Claim ................................................................. 16
V.   Trespass .................................................................................................. 20
VI.  Nuisance ................................................................................................. 23
VII.  Conspiracy .............................................................................................. 27
VIII. Failure to Warn and State Consumer Protection Act Claims ..................... 32
     A.    Preemption by FIFRA ......................................................... 32
          1.  Preemption of Failure to Warn Claims ....................... 32
          2.  Preemption of Consumer Protection Act Claims ......... 39
     B.    Consumer Fraud Act Regulatory Safe Harbor ..................... 40
     C.    Illinois Consumer Protection Act Claims ............................. 42
          1.  Standing ................................................................... 42
          2.  Federal Rule of Civil Procedure 9(b) ......................... 43
IX.  Negligent Training .................................................................................. 44
X.   Breach of Warranties ............................................................................... 46
     A.    Kansas Breach of Warranties ............................................... 46
     B.    Breach of Implied Warranties ............................................... 47
XI.  Design Defect .......................................................................................... 49
XII.  Missouri Crop Protection Act .................................................................. 50
XIII. Duty and Proximate Cause for Missouri 2016 Claim ................................ 51

Plaintiffs in this Multi-district Litigation filed a 94-count[1] Crop Damage Class Action Master Complaint against defendants Monsanto and BASF[2] on August 1, 2018. Both defendants have moved to dismiss.

## Factual Background

The alleged facts are taken as true for the purposes of the motions to dismiss. Plaintiffs are twenty-one soybean farmers from eight states: Arkansas, Illinois, Kansas, Mississippi, Missouri, Nebraska, South Dakota, and Tennessee. Each plaintiff alleges that its soybean crop was damaged by the herbicide dicamba when neighboring farmers planted genetically modified dicamba-resistant seeds and sprayed that crop with dicamba. Plaintiffs challenge Monsanto's commercialization of its dicamba-resistant cotton seeds in 2015 and soybean seeds in 2016 (collectively, "Xtend seeds"). The United States Department of Agriculture ("USDA") deregulated (or permitted for sale) the dicamba-resistant seeds in January 2015. However, plaintiffs contend that their commercialization was premature and improper because the United States Environmental Protection Agency ("EPA") had not yet approved a dicamba herbicide for use over the top of crops grown from those seeds. Plaintiffs add that the dicamba-resistant seeds were also tolerant to application of other herbicides, like Monsanto's glyphosate-based Roundup-branded herbicides.

---

[1] Due to the number of counts, the Court will refer to them using Arabic instead of Roman Numerals.

[2] The Court will refer to both defendants BASF Corporation (a Delaware corporation) and BASF SE (a German corporation) as "BASF." BASF Corporation is alleged to be a subsidiary and North American agent for BASF SE.

Bader Farms, a peach-growing plaintiff in this MDL (which has not joined the Master Complaint), filed one of the first complaints of its kind in 2016, alleging that neighboring farms planted Xtend seeds and then sprayed dicamba over the top of that crop. Bader alleged that the dicamba then drifted to the Bader peach orchard, damaging many trees and seriously diminishing the year's peach crop. Bader filed its lawsuit, eventually added BASF as a defendant, and this Court denied both defendants' motion to dismiss and Monsanto's motion for partial summary judgment. As stated, Bader grows peaches, not soybeans, and Bader is not part of the Master Complaint in this MDL.

Only one plaintiff in the Master Complaint brings claims related to 2016, the year Monsanto sold Xtend seed but did not sell the corresponding herbicide. That plaintiff, Jerry Franks of Missouri, represents himself and a class of "Missouri 2016" plaintiffs.

The other plaintiffs allege that in 2017 they grew non-dicamba-tolerant soybeans that were damaged by dicamba herbicide used on fields that were planted with dicamba-tolerant Xtend seeds. In 2017, however, the EPA approved Monsanto and BASF's new low-volatility dicamba herbicides (respectively named XtendiMax and Engenia). Earlier versions of dicamba had been on the market since the 1960s (though none manufactured by Monsanto), but it was not approved for in-crop use due to its volatility and propensity to drift (sometimes taking other herbicides with it), meaning it could cause damage to other, off-target growing plants. XtendiMax and Engenia were developed to address original dicamba's volatility problem so that they could be used over-the-top of crops, during the growing season, without harming nearby, non-tolerant crops.

The 2017 plaintiffs (that is, all plaintiffs other than Franks), challenge the design and sale of Monsanto and BASF's dicamba herbicide products. Plaintiffs contend, despite defendants' representations to the contrary, that both are unsuitable for in-crop use because they too, like the earlier versions of dicamba, are volatile and prone to move off-target and damage nearby, sensitive crops. The claim, then, is that the defendants, in their pursuit of increased profits, pushed the Xtend seeds and XtendiMax and Engenia herbicides forward and misrepresented the system as safe, knowing that non-dicamba-resistant crops and plants would be damaged. In fact, plaintiffs contend that such damage was to defendants' benefit, as it would cause farmers to defensively purchase dicamba-resistant seed to avoid damages.

Each plaintiff, on behalf of itself and a state-wide class, brings claims under its own state's laws, and they also seek to represent a nationwide class pursuing claims under the Lanham Act.[3] Defendants have moved to dismiss.

## Legal Standard

Defendants have moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the legal sufficiency of a complaint so as to eliminate those actions "which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001) (citing *Neitzke v. Williams*, 490 U.S. 319,

---

[3] The Master Complaint does not define a Nebraska class. This appears to be a mistake, as the complaint does refer to such a class in Counts 60-70.

326-27 (1989)). "To survive a motion to dismiss, a claim must be facially plausible, meaning that the 'factual content. . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Cole v. Homier Dist. Co., Inc.*, 599 F.3d 856, 861 (8th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court must "accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Id.* (quoting *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005)). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster. *Iqbal*, 556 U.S. at 678.

### The Motions to Dismiss

Monsanto raises 16 points in support of its motion to dismiss. BASF makes only 11. With only a couple of exceptions, the defendants' arguments are largely overlapping and complementary, and each is discussed in turn.

## I.    Failure to plead Monsanto product caused plaintiffs' injuries

Monsanto's first point is a challenge to all plaintiffs' products liability-related counts. Monsanto contends that, to establish causation, plaintiffs must identify the manufacturer responsible for placing the injury-causing product into the stream of commerce. That is, Monsanto suggests plaintiffs must demonstrate that it was Monsanto's product—XtendiMax—that landed on plaintiffs' fields. To be sure, a "threshold requirement for a products liability action is that the plaintiff identify the manufacturer or supplier responsible for placing the injury-causing product into the stream of commerce; this is the traditional requirement that plaintiff establish causation."

5

63 Am. Jur. 2d *Products Liability* § 75 (2016). Monsanto contends that this is a fatal problem for both the 2017 and 2016 plaintiffs: the 2017 plaintiffs do not plead that Monsanto's new dicamba moved off-target and caused damage to their crops, and Franks, the 2016 plaintiff, did not plead that old dicamba herbicide had been applied to Monsanto's Xtend seeds.

These are merely variations of defendants' earlier causation challenges. This Court has already ruled on the causation issue as it relates to the several products liability claims in the Bader Farms case, and the result is the same here. "The fact that Monsanto did not manufacture, distribute, or sell the old dicamba herbicide that actually caused the [2016] damage is irrelevant—it is not part of the causal link under plaintiffs' theory of the claim." *In re Dicamba Herbicides Litig.*, 1:16-CV-299-SNLJ, 2018 WL 2117633, at *2 (E.D. Mo. May 8, 2018) (the "May 8 order"). As this Court explained, causation could be established if it is proved that Monsanto marketed and sold its dicamba-resistant seed to third-party farmers knowing that they would spray dicamba that may harm nearby, non-resistant crops. *Id.* For 2016 damage, this Court has already held that causation has been pleaded. Although Monsanto suggests that plaintiff Franks's similar 2016 claims lack an allegation that a non-Monsanto dicamba herbicide had been applied to Monsanto's Xtend seeds, the complaint does exactly that. (*E.g.*, #137 ¶ 944.)

Monsanto also argues that the May 8 order does not apply to the 2017 claims because the 2016 claims are based on the launch of dicamba-resistant seed without a corresponding low-volatile herbicide. Monsanto explains that to plead but-for causation

for the 2017 claims, plaintiffs were required to allege that it was the new XtendiMax that allegedly moved off-target and damaged crops.

The key to both the 2016 and 2017 claims, however, is not the herbicide—it's the Xtend seed. The only reason to purchase and plant Xtend seeds is, according the plaintiffs, to use it with either the new or the old dicamba herbicides. For the 2016 claims, as with Bader's claims, plaintiffs plead their damages were caused by foreseeable misuse of dicamba with the Xtend seed. For the 2017 claims, causation is supplied by either the third-party farmers' legitimate use of new dicamba herbicide that did not work as promised, or their foreseeable misuse of old dicamba herbicide. As with the 2016 allegations, which entity manufactured the dicamba herbicide is not part of the causal link under plaintiff's theory. *See* 2018 WL 2117633, at *2 . Whether XtendiMax, Engenia, or some other dicamba was used on the crops (or even other over-the-top herbicides), the allegations are that Monsanto and BASF were in a partnership, joint venture, joint enterprise, or otherwise agreed to share technologies in bringing the Xtend seed and "new dicamba" to market. Thus, under that theory, both defendants could be liable for injuries caused by third party farmers' use of the seed, regardless of which entity manufactured the dicamba herbicide itself.

## II.     Lanham Act

Plaintiffs' Count 1—a nationwide class action—claims that Monsanto made misrepresentations in violation of the Lanham Act, 15 U.S.C. § 1125(a). These were statements, plaintiffs explain, that were false or misleading in convincing third-party farmers to purchase and use dicamba-resistant seed and dicamba herbicide, causing injury

to their neighbors' non-resistant soybeans. Specifically, plaintiffs allege that defendants stated that the Xtend Crop System could be safely employed utilizing over-the-top application of dicamba herbicides and that the dicamba would not drift.

### A. "Zone of interest"

To state a claim under the Lanham Act, plaintiff must plead: (1) an injury within the "zone-of-interest," that is, "to a commercial interest in sales or business reputation," (2) that was "proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 134, 140 (2014). Monsanto first argues that plaintiffs lack standing to pursue their claim under the Lanham Act because there is no alleged injury within the "zone of interest."

In that regard, Monsanto maintains that plaintiffs must be competitors of the defendant to state a claim, citing *POM Wonderful LLC v. Coca-Cola Co*., 572 U.S. 102, 107 (2014) ("the cause of action is for competitors, not consumers"), and indeed, in that case the parties were competitors. But the Act contemplates other relationships as well. For example, *Lexmark*, on which Monsanto also relies, was a case between a printer toner cartridge supplier and the manufacturer of components necessary for remanufacture. *Lexmark*, 572 U.S. at 112. The component manufacturer claimed that the toner manufacturer violated the Lanham Act when it made statements asserting that the component manufacturer's business was illegal. The Supreme Court explicitly stated that "although diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury cognizable under § 1125(a)." *Id.* at 138. *Lexmark* held that a plaintiff must "allege an injury to a commercial interest in

reputation or sales proximately caused by the defendant's misrepresentations." 572 U.S. at 140. That is, a Lanham plaintiff must be a commercial actor suffering commercial injuries instead of being a "consumer who is hoodwinked into purchasing a disappointing product." *Id.* at 132.

*In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1222 (D. Kan. 2015), is instructive. In that case, the plaintiffs were farmers who did not purchase the defendant's genetically modified ("GM") seed, but they claimed they were damaged commercially because other farmers did grow corn from the GM seeds, and the GM corn was mixed with plaintiff farmers' corn before sale. Plaintiffs claimed defendant had misled the other farmers that China—the primary purchaser of the corn—had approved the GM seed. In fact, however, China had not approved the seed and refused to buy corn from the "contaminated corn supply," thus harming plaintiffs commercially. *Id.* The court therefore denied the defendant's standing-based motion to dismiss the Lanham Act claims. Like the plaintiffs in *Syngenta*, plaintiffs here are commercial actors, not consumers, and as such their allegations fall within the "zone of interest" required for standing under the Lanham Act.

### B. Lack of standing for 2016 claims

Monsanto next argues that plaintiff Franks lacks standing for his separate 2016 Lanham Act claims for the additional reason that his claim is based on intervening unlawful conduct. Monsanto recognizes that this Court has previously held that intervening criminal conduct did not necessarily cut off the chain of causation under Missouri state law. But Monsanto maintains that such conduct does break the causal

nexus under federal standing requirements. The Supreme Court has held that Article III standing exists if an injury in fact is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party who is not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Relying on *Lujan*, Monsanto points out that it was illegal for third party farmers to use dicamba herbicides with its Xtend seeds in 2016, so the intervening criminal conduct—spraying dicamba on Xtend seeds in 2016—severs the causal chain connecting Monsanto's representations to any wrongdoing. *Lujan*, however, is distinguishable. In that case, causation and redressability hinged on the response of a regulated third party to government action or inaction—a response that was difficult to predict. *See* 504 U.S. at 561. *Lujan* does not stand for the proposition that foreseeable intervening criminal conduct automatically cuts off the causal chain to defeat standing. This Court's earlier order applies for the reasons already stated. Franks has sufficiently alleged standing.

## C. Proximate cause

Next, Monsanto argues that plaintiffs' alleged harm is too remote from Monsanto's alleged conduct to establish proximate cause because plaintiffs are at best "indirect" victims of the allegedly false advertising. In rejecting a similar proximate cause argument, the *Syngenta* court noted, "the Supreme Court recognized in *Lexmark* that there may be an intervening step of consumer deception, as a plaintiff can be directly injured by a misrepresentation even in a case in which a third party, and not the plaintiff, relied on it." 131 F. Supp. 3d at 1221. In *Syngenta*, of course, the third party farmers who planted the GM seeds also suffered losses when China would not buy the GM corn.

10

Monsanto argues that in this case, in contrast, the direct "victims"—those who bought the Xtend seed—are not alleged to have lost any sales at all.  But this Court does not understand why that should matter.  Plaintiffs have undoubtedly alleged commercial injury because Monsanto's misrepresentations caused third parties to use dicamba that destroyed plaintiffs' crop, so there were no soybeans to sell.  In other words, it is a commercial interest in sales because plaintiff lost all its sales.  Plaintiffs have properly pleaded proximate cause.

### D.    Personal jurisdiction

Finally, with respect to the Lanham Act count, both defendants argue for dismissal for lack of personal jurisdiction over the claims of non-Missouri plaintiffs in light of *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773, 1781 (2017) ("*BMS*").  The primary focus of such an inquiry is the defendant's relationship to the forum state.  *Id.* at 1779.  A court may have general or specific personal jurisdiction over a defendant.  As the Court explained, in the case of a corporate defendant, general jurisdiction is present if the forum state is "one in which the corporation is fairly regarded as at home," such as the state in which a corporation is incorporated or has its principal place of business.  *Id.* at 1780 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)).  "A court with general jurisdiction may hear any claim against that defendant, even if all the incidents underlying the claim occurred in a different State."  *Id.* at 1780.  "Specific jurisdiction is very different."  *Id.*  To have specific jurisdiction, "the suit must arise out of or relate to the defendant's contacts with the *forum*."  *Id.* (emphasis in original; internal citations and

changes omitted). The Supreme Court held that defendants' rights under the Due Process Clause would be violated through exercise of personal jurisdiction over defendants with respect to claims brought by non-residents based on injuries outside the forum. *Id.* at 1780-81. "This remains true even when [resident] third parties … can bring claims similar to those brought by the nonresidents." *Id.* at 1781.

For reasons explained below, the personal jurisdiction analysis is different for each of the two defendants in this case.

### 1. **Monsanto**

Missouri courts have general jurisdiction over Monsanto because it is headquartered in Missouri. The Supreme Court was clear that its *BMS* decision did not prevent out-of-state plaintiffs from "joining together in a consolidated action in the States that have general jurisdiction over" the defendant. *Id.* at 1783. Notably, the case upon which Monsanto relies, *Chavez v. Church & Dwight Co., Inc.*, 17 C 1948, 2018 WL 2238191, at *10 (N.D. Ill. May 16, 2018), acknowledged that the defendant there was not subject to general jurisdiction in the state. That case is wholly distinguishable. Plaintiffs have filed their class action in a state with general jurisdiction over the defendant Monsanto; thus, this Court has personal jurisdiction over Monsanto.

### 2. **BASF**

On the other hand, this Court does not have general jurisdiction over defendant BASF because it is, unlike Monsanto, not "at home" in Missouri. *BMS*, 137 S. Ct. at 1780. BASF Corporation is incorporated in Delaware with its principal place of business

in either New Jersey or North Carolina[4].  To the extent this Court could exercise jurisdiction coextensive with the MDL transferor courts' jurisdiction, BASF is likewise not at home in any of the transferor court states.

Although *BMS* does not explicitly state that its holding applies to class actions, *see* 137 S. Ct. at 1788 n.4 (Sotormayor, J., dissenting), BASF urges this Court to hold that its logic does apply.  There is a split of authority among the courts, but this Court agrees with several courts in the Northern District of Illinois which have held that *BMS* applies with equal force in the class action context: "Nothing in *Bristol–Myers* suggests that it does not apply to named plaintiffs in a putative class action; rather, the Court announced a general principle—that due process requires a 'connection between the forum and the specific claims at issue.'"  *Practice Mgmt. Support Services, Inc. v. Cirque du Soleil, Inc.*, 301 F. Supp. 3d 840, 860–61 (N.D. Ill. 2018) (quoting *BMS*, 137 S.Ct. at 1781).  *See also DeBernardis v. NBTY, Inc.*, 2018 WL 461228, at *2 (N.D. Ill. Jan. 18, 2018) ("The Court believes that it is more likely than not based on the Supreme Court's comments about federalism that the courts will apply *Bristol–Myers Squibb* to outlaw nationwide class actions ... where there is no general jurisdiction over the Defendants."); *Greene v. Mizuho Bank, Ltd.*, 289 F.Supp.3d 870, 874, (N.D. Ill. Dec. 11, 2017); *McDonnell v. Nature's Way Prod., LLC*, 2017 WL 4864910, at *4 (N.D. Ill. Oct. 26, 2017).

Members of a nation-wide class action, aside from those class members from Missouri, do not have a connection between the forum and the specific claims at issue.

---

[4] BASF Corporation's research headquarters are alleged to be in North Carolina. BASF SE is a German corporation headquartered in Germany.

Thus this Court would not have personal jurisdiction over BASF with respect to those claims. The parties, however, have not addressed whether BASF may remain a party in the case as it pertains to claims of Missouri plaintiffs for Lanham Act violations. The nationwide class action claims against BASF only will be dismissed.

## III. Arkansas Plaintiffs' Counts 2-13

The Arkansas plaintiffs bring the following claims on behalf of themselves and an Arkansas class of plaintiffs: Strict Liability (Ultrahazardous); General Negligence; Strict Liability (Design Defect); Strict Liability (Failure to Warn); Negligent Design; Negligent Failure to Warn; Negligent Training; Breach of Implied Warranty (Fitness); Breach of Implied Warranty (Merchantability); Breach of Express Warranty; Trespass; and Civil Conspiracy.

Monsanto's XtendiMax herbicide was not for sale anywhere in 2016. In 2017, it was available in most areas—but it was not for sale in Arkansas. BASF's dicamba-based herbicide, Engenia, was the only dicamba herbicide registered for in-crop use in Arkansas in 2017. Monsanto argues the Arkansas claims thus fail to meet the requirement of alleging that a product manufactured by Monsanto caused plaintiffs' alleged crop damage.

As discussed above, however, the allegations are that Monsanto and BASF were in a partnership, joint venture, joint enterprise or otherwise agreed to share technologies in bringing the "new dicamba" to market with dicamba and resistant seeds. Thus, under that theory, both defendants could be liable for injuries caused to third parties by the use of the seed system. Defendant Monsanto cannot hide behind the Arkansas XtendiMax ban

14

when it intended for its seed to be used with XtendiMax or, allegedly, its BASF equivalent. Monsanto relies on pharmaceutical cases holding that a plaintiff cannot sue the name-brand drug manufacturer when the plaintiff consumed only the generic drug. *See, e.g.*, *Bell v. Pfizer, Inc.*, 716 F.3d 1087, 1092-93 (8th Cir. 2013). That line of cases is wholly inapposite here, however, where the defendants are alleged to be in a joint venture and a conspiracy.

Monsanto also attempts to insulate itself from liability by invoking this Court's statement in *Bader Farms v. Monsanto, Co.*, 2018 WL 1784394, *4 (E.D. Mo. Apr. 13, 2018) (the "April 13 Order") that "each company sells its own products—separately". Monsanto takes that statement out of context—this Court was not discussing joint venture liability related to 2017 damages. The language Monsanto cites pertains to 2015 and 2016 damages and the absence of a relevant BASF product at that time. This Court ultimately held that BASF could be liable under a conspiracy theory for counts that did not involve negligence, even in years when BASF did not have a relevant product on the market. *Id.* at *5. That Monsanto may not have manufactured the herbicide used in Arkansas with Xtend seeds in 2017 does not defeat plaintiffs' theory of causation; as stated in Section I, *supra*, the key to this case is the seed, not the herbicide.

Next, Monsanto argues that the Arkansas plaintiffs have not shown Monsanto owed them a duty of care. "As a general rule, a manufacturer has a duty to warn the ultimate user of the risks of its product." *Pfizer*, 716 F.3d at 1093. However, no Arkansas law "supports extending such a duty of care to the customer of a competitor using a competing product." *Id.* Again, Monsanto relies on the *Pfizer* line of cases—

inapposite pharmaceutical cases involving lawsuits not against the manufacturer of the product plaintiff ingested, but against a different, "name brand" manufacturer. That is not the situation presented here, in which it is alleged that Monsanto's Xtend seed was being used by third parties with their intended herbicides and caused damage to third parties (the plaintiffs). In addition, Arkansas law does impose a duty to provide products that are not unreasonably dangerous and to give adequate warning and instruction. Ark. Code Ann. § 16-116-101. Arkansas's model jury instructions further impose a duty of care to protect those in the area of use from unreasonable risk of harm and to provide adequate warning and instruction. AMI 1001, 1002, 1003. Arkansas plaintiffs have adequately alleged Monsanto owed a duty of care.

## IV.   Ultrahazardous Activity Claim

Each group of plaintiffs bringing 2017 claims brings state-law strict liability claims for "ultrahazardous activity." (Counts 2, 14, 25, 37, 50, 60, 71, and 84.) As in the other counts, they allege that Xtend Crop System has a high risk of serious harm to growers of non-dicamba-resistant plants and crops like soybeans. Despite this risk, plaintiffs allege, Monsanto and BASF together designed and promoted the system to accelerate and increase the system's use.

The parties appear to agree that the jurisdictions at issue here (except Nebraska) have adopted the approach set out in the Restatement (Second) of Torts for determining

whether activity may be considered ultrahazardous.[5]  The Restatement sets forth the

following factors:

1. High degree of risk of harm to person or land
2. Likelihood harm will be great
3. Inability to eliminate risk by exercise of reasonable care
4. Extent to which activity not a matter of common usage
5. Inappropriateness of the activity to the place where it is carried on
6. Extent to which value to community is outweighed by dangerous attributes

*Restatement (Second) of Torts*, § 520.[6]

Regardless of whether plaintiffs have alleged the necessary factors, Monsanto

contends that the ultrahazardous activity doctrine does not apply to the design,

promotion, and sale of products.  It is true that "[g]enerally, the manufacture of a product

or substance will not be considered, as a matter of law, an ultra-hazardous activity." *Akee*

*v. Dow Chem. Co.*, 293 F. Supp. 2d 1140, 1144 (D. Haw. 2002).   Furthermore, "while

the doctrine of ultra-hazardous activities imposes strict liability on a defendant engaged

in an ultra-hazardous activity, the doctrine requires that the plaintiff establish proximate

cause in order to prevail." *Id.* at 1143 (collecting cases).  In *Akee*, the plaintiffs claimed

_____

[5] *See, e.g.*, *Chapman Chem. Co. v. Taylor, for Use & Benefit of Wilson*, 222 S.W.2d 820, 827 (Ark. 1949); *Bullar v. Archway Skydiving Ctr., Inc*., 2012 WL 1565641, at *2-3 (S.D. Ill. May 2, 2012); *City of Neodesha v. BP Corp. N. Am., Inc*., 287 P.3d 214, 224 (Kan. 2012); *Elmore v. Dixie Pipeline Co.*, 245 So. 3d 500, 508-09 (Miss. App. 2017); *Maryland Heights Leasing, Inc. v. Mallinckrodt, Inc*., 706 S.W.2d 218, 226 (Mo. App. 1985); *Fleege v. Cimpl*, 305 N.W.2d 409, 414-15 (S.D. 1981); *Isabel v. Velsicol Chem. Co*., 327 F. Supp. 2d 915, 918-19 (W. D. Tenn. 2004).

[6] Nebraska appears to be a special case.  The Court agrees with defendants that Nebraska would not recognize plaintiffs' claims.  *See In re Derailment Cases*, 416 F.3d 787, 796 (8th Cir. 2005) (affirming dismissal of strict liability claim for ultrahazardous activity where plaintiff's bare allegation of transport of chemical by rail through populated area could not support claim, even if Nebraska recognized such a claim).

they suffered personal injuries as the result of the use of hazardous chemicals on pineapple plantations. The plaintiffs sued both the users of the chemicals and the manufacturers. The court held that plaintiffs could not state a claim against the manufacturers for ultrahazardous activity unless they "allege that their claimed injuries were directly caused by the Manufacturing Defendant's allegedly ultra-hazardous activity—i.e., the manufacture of the subject chemicals." *Id.* at 1143-44.

Plaintiffs here allege that the use of the products manufactured by defendants, and the defendants' actions encouraging third-party farmers to use their dangerous products, is what caused their injuries. They state that because it is nearly impossible to apply dicamba without causing drift, and because even a tiny amount of dicamba spread over an acre of non-resistant crops causes damage, that the dicamba is an ultrahazardous substance the use of which Monsanto bears responsibility. Further, plaintiffs state that the defendants' marketing accelerated the use of the dicamba system, which, by causing damage to non-resistant seeds, forced farmers to adopt it or face destruction of their crops.

Ultimately, however, the "activity" that is alleged to be dangerous is necessarily the use of the dicamba—not sales and marketing, and not manufacturing. Ultrahazardousness "is, in the contemplation of the law at least, a property not of substances, but of activities." *Indiana Harbor Belt R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1181 (7th Cir. 1990) (holding the manufacturer of chemical involved in a railroad accident and spill could not be held strictly liable for ultrahazardous activity.) In *Indiana Harbor* and *Akee*, it was not the defendant chemical manufacturers' activities

18

that had caused the plaintiffs' damages. Regardless of the Restatement factors, "the manufacturer of a product is not considered to be engaged in an abnormally dangerous activity merely because the product becomes dangerous when it is handled or used in some way after it leaves his premises, even if the danger is foreseeable." *Id.* (citing *City of Bloomington v. Westinghouse Elec. Corp.*, 891 F.2d 611, 616-17 (7th Cir.1989).

Plaintiffs cite to only one case in support of their view that a manufacturer can be held liable for "ultrahazardous activity" when the defendant's only activity was to manufacture and promote sale of a chemical. In *Chapman Chemical*, 222 S.W.2d 820, 827 (Ark. 1949), the Arkansas Supreme Court held a chemical manufacturer liable for a third party's use of the company's herbicide in cropdusting. However, in a later case, the Arkansas Supreme Court clarified that the imposition of strict liability in *Chapman* "arose out of the abnormal danger of the activity itself." *Tri-B Advert. Co. v. Thomas*, 278 Ark. 58, 60 (1982).

All in all, this Court is disinclined to extend the ultrahazardous activity doctrine to a claim that the manufacture, marketing, and sale of a product can be an ultrahazardous activity, as opposed to the actual use of the product itself. Again, no case has so held. Perhaps it is enough to say that it would be presumptuous for this Court to impose such an extension on these several states' laws. In any event, plaintiffs' theory is untenable. Their theory, which they admit is unique, is that the defendants' dicamba products are so hazardous that they cannot be used safely "over the top" under any circumstances and that the fraudulent (or at least misleading) marketing of the dicamba products makes its use irresistible to the consumer. Their claim seems to be that it is an ultrahazardous

activity to mislead others to engage in an ultrahazardous activity. This is essentially a repackaging of what is more properly pleaded—and what plaintiffs have indeed pleaded in the Lanham Act and other counts—as a claim for misrepresentation. And it is simply too much a stretch from the conventional notion of an ultrahazardous activity, which involves only the actual use of the product in question, without regard to any misconduct by defendants. After all, the rationale behind the doctrine is that an activity may carry a risk that "is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care. . . and despite any usefulness it may have for the community...." Restatement (Second) of Torts § 520, cmt. f. In contrast, plaintiffs' theory is dependent on defendants' misrepresentation to third-party farmers that they may safely use dicamba, when in fact, or so they allege, it is not an activity that can be carried out with reasonable care. Ultimately, plaintiffs' claim is that "lying" about the safety of an ultrahazardous activity—the spraying of dicamba—is itself an ultrahazardous activity. That claim is certainly actionable, but not under the ultrahazardous activity doctrine.

For those reasons, the plaintiffs' Strict Liability – Ultrahazardous Activity counts will be dismissed.

## V.     Trespass

Plaintiffs next claim that defendants committed trespass against them when "dicamba particles" were deposited onto their land without their permission. Trespass in Arkansas and Missouri requires that there be intentional direct physical interference with

the person or property of another. *See Patton v. TPI Petroleum, Inc.*, 356 F. Supp. 2d 921, 930 (E.D. Ark. 2005); *Philips v. Citimortgage, Inc.*, 430 S.W.3d 324, 330 (Mo. App. 2014). Trespass occurs in Illinois, South Dakota, Nebraska, Kansas, and Tennessee if a person causes a thing to enter the land of another. *Noble v. Am. Nat'l Prop. & Cas. Ins. Co.*, 297 F. Supp. 3d 998, 1006 (D.S.D. 2018) (quoting *Benson v. State*, 710 N.W.2d 131, 159 (S.D. 2006)); *Shoffner v. CSX Transp., Inc.*, No. 4:01cv54, 2013 WL 11521840, at *6 (E.D. Tenn. Mar. 26, 2013); *Millers Mut. Ins. Assoc. v. Graham Oil Co.*, 668 N.E.2d 223, 230 (Ill. App. Ct. 1996) (citing *Dial v. City of O'Fallon*, 81 Ill. 2d 548, 556–59 (Ill. 1980)); *United Proteins, Inc. v. Farmland Indus., Inc.*, 915 P.2d 80, 83 (Kan. 1996); *Obermiller v. Baasch*, 823 N.W.2d 162, 174 (Neb. 2012).

As with the other claims, plaintiffs allege that the third-party farmers—not defendants Monsanto or BASF—sprayed dicamba such that it moved off-target and onto plaintiffs' properties. Defendants thus contend that they cannot be held liable for trespass. To be sure, "courts do not impose trespass liability on sellers for injuries caused by their product after it has left the ownership and possession of the sellers." *City of Bloomington*, 891 F.2d at 615. This is because sellers no longer exert control over the product. *See id.*; *see also Town of Westport v. Monsanto Co.*, CIV.A. 14-12041-DJC, 2015 WL 1321466, at *4 (D. Mass. Mar. 24, 2015) ("Courts have dismissed claims of intentional trespass against manufacturers on the basis of a lack of control post-sale"). And notably, plaintiffs do not allege that defendants and the third-party farmers were engaged in an agency relationship, joint venture, or conspiracy.

Plaintiffs respond that defendants retain control over their products after sale through licensing agreements. However, there are no allegations that Monsanto's seed licensing agreement with farmers includes that Monsanto may terminate the agreement for misuse of dicamba. Defendants therefore did not control dicamba at the time of the alleged trespass.

The *Syngenta* case is again instructive. Although the *Syngenta* court declined to dismiss the plaintiffs' Lanham Act claims, it did dismiss trespass claims brought in Arkansas, Kansas, Mississippi, Nebraska, and Tennessee under somewhat similar circumstances. 131 F. Supp. 3d at 1210-11. Even though plaintiffs there alleged that the defendant seed manufacturer knew contamination would occur when its seed product was used as intended, the defendant did not cause the trespass itself. *Id.* Plaintiffs' argument that defendants intended the property invasion did not save plaintiffs' claims because those invasions were alleged to have occurred after the product left defendants' control. *Id.*

All plaintiffs' cited cases seem to involve ongoing promotion, aiding, abetting, assisting, or contributing by the defendants in commission of the trespass. The plaintiffs do not cite to any cases in which a manufacturer was held liable for its product's trespass after being sold to the buyer. Cases in which the defendant is alleged to have encouraged or acquiesced to a trespass are distinguishable from cases where, as here, a manufacturer has sold its product and no longer exerts control over it. Plaintiffs rely on *Wyatt v. Miller*, 500 S.W.2d 590, 592 (Ark. 1973), for example, where an individual who mistakenly believed he owned certain property allowed his father to cut and remove hay

from the property. That case is different from one in which a seller has sold a product which then winds up on the property of another. In *City of Bloomington*, for example, Monsanto sold PCBs to another entity that contaminated plaintiff's property with the PCBs (plaintiff also named the contaminating entity as a defendant). 981 F.2d at 615. That court held that because Monsanto did not cause the trespass "by command, request, or physical duress…Monsanto thus lacked any kind of trespassory intent." *Id.*

As with the ultrahazardous claim, plaintiffs ask this Court to extend the several states' laws to reach beyond the traditional purview of the claim. This Court declines to do so. Plaintiffs' trespass theory includes arguments that it was "impossible" to prevent dicamba from drifting and that defendants "actively encouraged use of dicamba but misrepresented its safety." But that theory is essentially a combination of products liability and misrepresentation theories with a conventional trespass claim. Surely there is no need for such a complicated hybrid cause of action when plaintiffs have standalone causes of action for products liability and misrepresentation, as discussed elsewhere in this memorandum.

Plaintiffs' trespass claims will be dismissed.[7]

## VI.    Nuisance

Plaintiffs next bring claims for nuisance under Illinois, Kansas, Nebraska, Mississippi, and South Dakota law (Counts 22, 35, 41, 68, and 82). A private nuisance is an "invasion of another's interest in the private use and enjoyment of land." *In re*

---

[7] Notably, it appears that defendants did not specifically move to dismiss the *Bader Farms* plaintiff's trespass count.

*Syngenta*, 131 F. Supp. 3d at 1212-13 (citing *Restatement (Second) of Torts* § 821D).

Again, plaintiffs allege that they were harmed by third-party farmers' application of

dicamba herbicides in a manner that resulted in off-site movement of the herbicide onto

plaintiffs' farms. Defendants contend that they cannot be liable on a nuisance theory

predicated on post-sale use of their products.

Indeed, courts appear to agree that product manufacturers are not liable for

nuisance caused by post-sale use of their products. *See Tioga Pub. Sch. Dist. No. 15 v.*

*U.S. Gypsum Co*., 984 F.2d 915, 920 (8th Cir. 1993). *Tioga*, for instance, held that

"nuisance law does not afford a remedy against the manufacture of an asbestos-

containing product to an owner whose building has been contaminated by asbestos

following installation of that product in the building." *Id.   See also City of Bloomington*,

891 F.2d at 614; *In re Syngenta Mass Tort Actions*, 272 F. Supp. 3d 1074, 1091 (S.D. Ill.

2017) ("[A] seller of a product is not liable for a private nuisance caused by the use of

that product after it has left the seller's control . . . ."); *Johnson Cty., Tenn. v. U.S.*

*Gypsum Co*., 580 F. Supp. 284, 294 (E.D. Tenn. 1984) (dismissing nuisance claim based

on sale of asbestos-containing products), set aside in part on other grounds, 664 F. Supp.

1127 (E.D. Tenn. 1985); *Schiller v. Mitchell*, 828 N.E.2d 323, 330 (Ill. App. Ct. 2005);

*Rosenfeld v. Thoele*, 28 S.W.3d 446, 452 (Mo. Ct. App. 2000). The Nebraska *Syngenta*

case also recognized the general rule that manufacturers are not liable for nuisance

caused by their product after the product leaves the seller's control.  *In re Syngenta*, 131

F. Supp. 3d at 1213 (citing *City of Bloomington*, 891 F.2d at 615).  This rule is all the

more sensible when viewed in the context that no injunctive relief is available to abate a nuisance if the defendant has no control.

Plaintiffs insist, however, a defendant is liable for nuisance under the Restatement "not only when he carries on the activity but also when he participates to a substantial extent in carrying it out," *Restatement (Second) of Torts* § 834, and where defendant "knows that [such an invasion] is resulting or is substantially certain to result from his conduct," *id.* § 825. Regardless, these provisions do not undo the general rule that manufacturers are not liable for post-sale nuisance. Like the rationale in trespass cases, manufacturers have no liability for nuisance claims because they no longer have control over the product after its sale to third parties. *See Traube v. Freund*, 333 Ill. App. 3d 198, 202 (Ill. App. 2002) (seller had no control over pesticide used by its customer, so seller not liable for nuisance when pesticide polluted customer's neighbor's lake); *Gary R. Prince Revocable Trust v. Blackwell*, 735 F. Supp. 2d 804, 813 (M.D. Tenn. 2010) (on summary judgment, defendant construction company had no control over property, so not liable for nuisance).

Plaintiffs' citations in support of their nuisance claims are distinguishable. In *Port of Portland v. Monsanto*, 2017 WL 9098079 (D. Or. April 18, 2017), Monsanto manufactured PCBs and was aware they could not be contained within intended applications. The court refused dismissal, but the court was addressing state law not relevant here, and it did not even acknowledge the general rule that product manufacturers are not liable for nuisances created by post-sale use of their products. In *City of San Diego v. Monsanto*, 2017 WL 5632052 (S.D. Cal. Nov. 22, 2017), the court

refused dismissal because Monsanto knew PCBs were causing contamination but continued to promote the use and sale of PCBs and allegedly told customers to dispose of them in unsuitable landfills.  That case, however, was decided under California law, which allows hazardous wastes nuisance suits even where the offending product is no longer under the control of the manufacturer.  *Id.* at *7.

Plaintiffs' other cases are likewise distinguishable.  For example, in *King v. Cole's Poultry, LLC*, 114CV00088MPMDAS, 2016 WL 6993763, at *7 (N.D. Miss. Nov. 29, 2016), the court allowed a claim for nuisance to proceed against Peco, which supplied chickens to a chicken farm; although other entities actually operated the chicken facility, Peco maintained authority over the process and day-to-day operations.  No such control is present here.

The refrain is the same in *In re StarLink Corn Products Liability Litigation*, 212 F. Supp. 2d 828 (N.D. Ill. 2002).  There, the plaintiffs alleged that defendant created a private nuisance by distributing GM corn seeds knowing that drifting pollen would cross-pollinate with neighboring corn crops.  But the manufacturer "had an affirmative duty to enforce [its] farmers' compliance with the Grower Agreements [which] arguably gave [the manufacturer] some measure of control over [the product's] use, as well as a means to abate any nuisance covered by its misuse."  *Id.* at 847.  As noted, and in contrast, the license agreements alleged in this case do not suffice to give defendants any such control.

Once again, this Court is disinclined to allow the expansion of state law claims, especially in view of plaintiffs' other claims that more properly fit the circumstances. Plaintiffs' nuisance claims will be dismissed.

## VII.	Conspiracy

Plaintiffs bring conspiracy claims against the defendants in Arkansas, Illinois, Kansas, Mississippi, Missouri, Nebraska, South Dakota, and Tennessee (Counts 13, 24, 36, 42, 59, 70, 83, and 94).  To prove a civil conspiracy, plaintiffs must show that: (1) two or more persons (2) have combined to accomplish a purpose (3) that is unlawful, oppressive, or accomplishes some purpose not in itself unlawful or oppressive by unlawful, oppressive, or immoral means, (4) to the injury of another. *See Chambers v. Stern*, 64 S.W.3d 737, 743 (Ark. 2002); *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62 (1994); *Orr v. Morgan*, 230 So. 3d 368, 375 (Miss. Ct. App. 2017); *Salem Grain Co., Inc. v. Consol. Grain & Barge Co.*, 900 N.W.2d 909, 923–24 (Neb. 2017); *Rock Ivy Holding, LLC v. RC Properties, LLC*, 464 S.W.3d 623, 643 (Tenn. Ct. App. 2014). Three relevant states require plaintiffs to prove a fifth element:  that there was a meeting of the minds on the object or course of action to be taken.  *See Stoldt v. City of Toronto*, 678 P.2d 153, 161 (Kan. 1984); *M.W. v. S.W.*, 539 S.W.3d 910, 915 (Mo. Ct. App. 2017); *Huether v. Mihm Transp. Co.*, 857 N.W.2d 854, 861 (S.D. 2014).  A conspiracy claim cannot stand alone—rather, the "function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts."  *Adcock*, 164 Ill. 2d at 62 (citing W. Prosser, *Torts* § 46, at 293 (4th ed. 1971)).

Defendants insist that this Court should dismiss the conspiracy claims because conspiracy requires an underlying intentional tort.  With the dismissal of plaintiffs'

trespass claims, defendants say, plaintiffs have no underlying intentional tort to support a conspiracy.

Plaintiffs insist that the relevant jurisdictions all allow civil conspiracy cases to proceed without an underlying intentional tort, relying heavily on the Illinois Supreme Court's language in *Adcock,* 164 Ill. 2d at 64, and the Restatement (Second) of Torts § 876. The Illinois Supreme Court held that although "a civil conspiracy is based upon intentional activity, the element of intent is satisfied when a defendant knowingly and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *Adcock*, 164 Ill. 2d at 64. The court then added, "we reject [defendant's] claim that a cause of action for civil conspiracy does not arise unless one of the conspirators commits an intentional tort in furtherance of the conspiracy." *Id.* Similarly, the Iowa Supreme Court, relying on *Adcock*, held that "so long as the underlying actionable conduct is of the type that one can plan ahead to do, it should not matter that the legal system allows recovery upon a mere showing of unreasonableness (negligence) rather than requiring an intent to harm." *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 173 (Iowa 2002).

The Restatement appears to require only a underlying tortious or otherwise unlawful act. *Restatement (Second) of Torts* § 876(a); *see, e.g.*, *Adcock*, 164 Ill. 2d at 64; *Jo Ann Howard & Assocs., P.C. v. Cassity*, No. 4:09cv1252ERW, 2012 WL 3984486, at *10 (E.D. Mo. Sept. 11, 2012); *Vetter v. Morgan*, 913 P.2d 1200, 1205 (Kan. App. 1995). The Restatement—which, inexplicably, is not quoted in the briefing—states in pertinent part:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, ….

*Restatement (Second) of Torts* § 876 (1979). Under these provisions, it appears that liability attaches whether the underlying tort is intentional or negligent. *See id.*, cmt. a, illus. 2; cmt. b, illus. 6.

To be sure, there is ample caselaw from relevant jurisdictions recognizing conspiracy claims based on non-intentional torts. *See, e.g.*, *Beck v. Koppers, Inc.*, No. Civ.A. 303CV60PD, 2006 WL 288350 (N.D. Miss. Feb. 3, 2006) (conspiracy, negligence, and gross negligence claims involved allowing harmful chemicals to migrate into plaintiff's neighborhood); *Blaes v. Johnson & Johnson*, 71 F. Supp. 3d 944, 945-47 (E.D. Mo. 2014) (allowing conspiracy count in conjunction with failure to warn and negligence); *Greene v. Brown & Williamson Tobacco Corp.*, 72 F. Supp. 2d 882, 886 (W.D. Tenn. 1999) (negligence, strict liability); *Berg v. Johnson & Johnson*, No. CIV. 09-4179-KES, 2010 WL 3806141 (D.S.D. Sept. 21, 2010) (claims related to misleading advertising for product that allegedly caused ovarian cancer); *Eicher v. Mid Am. Fin. Inv. Corp.*, 275 Neb. 462, 478 (2008) (violation of consumer protection act); *Zetor N. Am., Inc. v. Rozeboom*, 3:15-CV-03035, 2018 WL 3865411, at *15 (W.D. Ark. Aug. 14, 2018) (underlying tortious activity of trademark infringement, which in Arkansas does not require specific intent).

Those cases notwithstanding, defendants press the point (which the plaintiffs concede) that parties cannot conspire to commit negligence, which, of course, is the rationale behind the conventional requirement for an underlying intentional tort. Soon after the adoption of § 876 in 1979, the United States Court of Appeals for the D.C. Circuit in *Halberstam v. Welch*, 705 F.2d 472, 477 (1983) explored in detail the legal framework regarding vicarious liability for concerted action. The court observed that the two subsections of Restatement § 876 correspond generally to two variations of vicarious liability: subsection (a) of the Restatement corresponds to conventional conspiracy, or concerted action by agreement; subsection (b) corresponds to aiding-abetting liability, concerted action by substantial assistance. As the *Halberstam* court explained it,

> The prime distinction between civil conspiracies and aiding-abetting is that a conspiracy involves an agreement to participate in a wrongful activity. Aiding-abetting focuses on whether a defendant knowingly gave "substantial assistance" to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct.

*Id.* at 478. The court lamented that "[c]ourts and commentators have frequently blurred the distinction between the two theories of concerted liability." *Id.* Although dicta, the *Halberstam* court also observed that "it is difficult to conceive of how a conspiracy could establish vicarious liability where the primary wrong is negligence, but a secondary defendant could substantially aid negligent action." *Id.* (emphasis added); *accord State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 937 (1991). This appears to be a tacit recognition of the truism that parties cannot conspire or intend to commit negligence under subsection (a). In contrast, aiding-abetting liability under subsection (b) does not depend on an agreement to commit an underlying tort, whether intentional or negligent.

Notably, cases relied upon by plaintiff, in which the courts approve of a conspiracy to commit negligence, do not address this dichotomy.

In this case, plaintiffs allege a scheme to market, sell, and expand sales and profits from the Xtend Crop system, and they describe the defendants' intertwined activities at length. However, plaintiffs are not entirely clear which tort claims may serve as the underlying tortious conduct to the conspiracy count, much less do they identify which prong of the Restatement they are proceeding under. It appears that they have alleged intentional tortious conduct on the parts of both defendants to sustain a conspiracy claim for, at least, false advertising and fraudulent misrepresentation under the Lanham Act. As for counts going to negligence, it unclear whether plaintiffs are grounding their claims under the Restatement's subsection (a), the conventional conspiracy theory, or under subsection (b), the aiding-abetting theory. If brought under subsection (b), it is irrelevant, as noted, whether the underlying tortious act is intentional or negligent. On the other hand, if the negligence claims are brought under subsection (a), this Court would be faced with the difficult task of reconciling the claims with the truism that parties cannot conspire to commit negligence. *Halberstam,* 705 F.2d at 478; *Ridenhour*, 248 Kan. at 937. In any event, this Court need not decide the propriety of the underlying negligence claims until plaintiffs have clarified whether those claims are grounded in subsections (a) or (b), and the parties have fully briefed these additional issues. And if indeed plaintiffs make clear that the underlying negligence claims are being brought under subsection (b), the conundrum posed under subsection (a) need not be addressed. As such, the Court

denies the motion to dismiss as it pertains to the remaining underlying intentional torts and withhold ruling on the propriety of underlying negligence claims.[8]

## VIII.  Failure to Warn and State Consumer Protection Act Claims

Plaintiffs bring failure to warn claims both as strict liability and common law negligence claims in Arkansas, Illinois, Kansas, Mississippi, Missouri, Nebraska, South Dakota, and Tennessee (Counts 5, 7, 17, 19, 27, 29, 38, 45, 47, 53, 55, 64, 65, 74, 76, 86, and 88).  Plaintiffs also bring consumer fraud act claims in Illinois and Nebraska (Counts 23 and 69).  Monsanto argues these claims are preempted and that they are inadequately pleaded.  BASF does not challenge these counts on preemption grounds. However, BASF moves to dismiss the Illinois consumer fraud act claims on the grounds that it is inadequately pleaded, and BASF moves to dismiss the Nebraska consumer fraud claim because the act exempts federally regulated conduct.

### A.    Preemption by FIFRA

#### 1.    Preemption of Failure to Warn Claims

Monsanto argues the failure to warn claims should be dismissed because they are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7

---

[8] The Court acknowledges that, in the *Bader Farms* case, the Court held in the context of Bader's claims for 2015 and 2016 damages that BASF could only be liable for Monsanto's intentional torts in furtherance of the conspiracy.  And then only for the intentional tort of trespass, in particular.  Consequently, the Court held that the negligence counts could not be used as the underlying tortious conduct with respect to the conspiracy for 2015 and 2016.  *Bader Farms*, 2018 WL 1784394 at *5. These holdings, however, were based on BASF's uncontested contention that only intentional torts would suffice as the underlying predicate for the conspiracy claim.  To the extent this Court's rulings are inconsistent with that in *Bader Farms*, the parties in *Bader Farms* are invited to re-address the conspiracy claim with additional briefing.

U.S.C. § 136v(b), which regulates the use, sale, and labeling of pesticides. The United States Environmental Protection Agency ("EPA") is tasked with implementing FIFRA. In *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 438 (2005), the Supreme Court explained the interplay and coordination between FIFRA and the EPA. A manufacturer seeking to register a pesticide must submit a proposed label to the EPA. *Id.* The EPA may then "register" the pesticide if it determines that the pesticide is effective, will not cause unreasonable adverse effects on humans and the environment, and complies with the statute's prohibition on "misbranding," discussed below. *Id.* Despite this, however, the EPA does not evaluate pesticide efficacy for routine label approvals—thus, the "EPA's approval of a pesticide label does not reflect any determination on the part of the EPA that the pesticide will be efficacious or will not damage crops or cause other property damage." *Id.* at 440 (internal quotation omitted). And, as *Bates* acknowledged, EPA approval of a label is not dispositive regarding whether a product label is accurate. *See id.*[9] On the other hand, FIFRA does have qualitative requirements for labels. FIFRA's requirements include a prohibition on "misbranding," which occurs if a label contains a "false or misleading" statement, if it "does not contain adequate instructions for use, or if its label omits necessary warnings or cautionary statements." *Id.* at 438-39.

_____

[9] FIFRA states that "[i]n no event shall registration of [a pesticide] be construed as a defense for the commission of any offense under this subchapter." 7 U.S.C. § 136a(f)(2). Instead, FIFRA provides that, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of the subchapter." *Id.*

Although it is unlawful under FIFRA to sell a pesticide that is EPA-registered but "misbranded," and the EPA may cancel a registration on its own for misbranding, FIFRA does not provide a private right of action for individuals to sue for damages caused by such misbranding. *Id.* *Bates* made clear, however, that individuals may file lawsuits under applicable state law to the extent the state law is not preempted by FIFRA. *Id.*

FIFRA's preemption provision is that "A state shall not impose or continue in effect any requirements for labeling or packaging <u>in addition to or different from</u> those required under this subchapter." 7 U.S.C. § 136v(b) (emphasis added). The holding in *Bates* tracks the statute. FIFRA pre-empts state law—judge-made law as well as statutes and regulations—if the state law (1) sets forth "a requirement 'for labeling or packaging,'" and (2) imposes "a labeling or packaging requirement that is 'in addition to or different from those required under this subchapter.'" 544 U.S. at 443-44 (quoting 7 U.S.C. § 136v(b)).

In this case, plaintiffs claim that defendants "failed to provide adequate warning and instructions by label or otherwise" and that "the labels were false, misleading and failed to contain warnings or instructions adequate to protect or prevent harm to the environment, including susceptible non-resistant plants and crops, including soybeans." Monsanto responds that the failure to warn claims are preempted because those claims, in effect, seek to impose label requirements that are different from or in addition to those imposed by FIFRA.

Plaintiffs insist their claims are not preempted for two reasons. First, they argue their failure to warn claims are, at least in part, based on matters other than labeling, so

they are not preempted.  Plaintiffs allege that Monsanto misrepresented the safety of the

crop system, concealed and failed to warn of risks, in a variety of ways, including in-

person discussion, websites, Facebook, Twitter, Instagram, YouTube, Snapchat,

Pinterest, and Linked In.  None of these other matters, plaintiffs argue, involves a label,

which is defined as "the written, printed, or graphic matter on, or attached to, the

pesticide or device or any of its containers or wrappers." 7 U.S.C. § 136(p)(1).  At least

one federal Court of Appeals has held that FIFRA does not preempt state law claims

going to something other than the label, such as a marketing brochure. *See Indian Brand*

*Farms, Inc. v. Novartis Crop Prot. Inc*., 617 F.3d 207, 221 (3d Cir. 2010).  There, the

plaintiff's claims related to the marketing brochure were for negligent misrepresentation

and fraud.  In addressing the marketing brochure, the Third Circuit stated

> [The brochure] cannot be read as providing a supplement to the [pesticide]
> label.  Its function is to point out the advantages of the new product to
> wholesalers and retailers, as well as farmers.  Importantly, it contains no
> instructions for the use of [pesticide].  If we were to construe the term
> "labeling" as including the [pesticide] brochure, then all sales and
> marketing materials would necessarily be included within the scope of that
> term.  We are confident that such was not the intent of Congress.

*Id.* at 218.

Monsanto relies on two cases in support of its position that any failure to warn

claim is ultimately based on the labeling.  In the first case, the Eleventh Circuit held "any

claims that point-of-sale signs, consumer notices, or other informational materials failed

adequately to warn the plaintiff necessarily challenge the adequacy of the warnings

provided on the product's labeling or packaging." *Papas v. Upjohn Co.*, 985 F.2d 516,

519 (11th Cir. 1993).  Similarly, the Supreme Court of Kansas, relying on *Papas*, held

that a "claim that communication by means other than labeling was inadequate necessarily challenges the label and is preempted." *Jenkins v. Amchem Prods., Inc*., 886 P.2d 869, 882 (Kan. 1994).

*Indian Brand Farms*, though, a more recent case, is more persuasive because it is based on a more literal reading of the statute, limiting its reach to labeling and packaging. And in fact, Monsanto makes no attempt to distinguish *Indian Brand Farms.* Moreover, this Court is unsure just why failure to warn claims involving matters other than labeling "necessarily" challenge the label. Accordingly, this Court agrees that plaintiffs' claims for non-label-related marketing efforts are not preempted, even to the extent that those claims are based in part on failure to warn.

Second, plaintiffs insist, with respect to failure-to-warn claims they do make regarding labels, that they do not seek to impose requirements that are "in addition to or different from" FIFRA. Rather, they maintain that the state laws upon which their claims rely are consistent with FIFRA. Like FIFRA, laws of each relevant state require adequate warning. As explained above, FIFRA requires that a label comply with FIFRA's prohibition on "misbranding," which occurs if a label contains a "false or misleading" statement or if it "does not contain adequate instructions for use, or if its label omits necessary warnings or cautionary statements." *Bates*, 544 U.S. at 438. And, as noted, "although FIFRA does not provide a federal remedy to those injured as a result of a manufacturer's violation of FIFRA's labeling requirements, nothing in § 136v(b) precludes States from providing such a remedy." *Id.* at 432. In that respect, *Bates* instructs that "To survive preemption, the state-law requirement need not be phrased in

the *identical* language as its corresponding FIFRA requirement." *Id*. at 454. Further, even where a state-law requirement does impose broader obligations than does FIFRA, it is preempted only "to the extent of that difference." *Id.* at 453.

Under FIFRA, a label is "misbranded" if

- it contains any statement false or misleading in any particular, 7 U.S.C. § 136(q), or

- it "does not contain directions for use which are necessary…and if complied with…are adequate to protect health and the environment" or "does not contain a warning or caution statement which may be necessary and if complied with … is adequate to protect health and the environment." 7 U.S.C. §§ 136(q)(1)(F), (G). *See also Bates*, 544 U.S. at 438.

In addition, a label must be "expressed in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use" 40 C.F.R. § 156.10(a)(2)(i). Furthermore, directions for use "must be stated in terms which can be easily read and understood by the average person likely to use or to supervise the use of the pesticide [and] . . . adequate to . . . prevent unreasonable adverse effects on the environment." 40 C.F.R. § 156.10(i)(1)( i).

Here, plaintiffs argue that the complaint closely tracks those provisions of FIFRA. They allege that Monsanto did not provide the adequate warning that both FIFRA and state laws require, and that labels were false, misleading and failed to contain warnings or instructions adequate to protect to prevent harm to the environment, including soybeans. In response, Monsanto cites several cases that did indeed find preemption of state-law claims regarding pesticide labels: *Smith v. Hartz Mountain Corp*., No. 12-CV-662, 2012 WL 5451726, at *1–3 (N.D. Ohio Nov. 7, 2012); *Wilgus v. Hartz Mountain Corp*., No.

12-CV-86, 2013 WL 653707, at *4–6 (N.D. Ind. Feb. 19, 2013); *In re Syngenta*, 131 F.

Supp. 3d at 1208. But those cases have been repeatedly criticized. In *Carias v.*

*Monsanto Co*., 15CV3677JMAGRB, 2016 WL 6803780, at *6 (E.D.N.Y. Sept. 30,

2016), for example, the court observed,

> None of the cases are persuasive on this question. The analysis in each case
> is cursory…. Notably, in two of these cases, *Smith* and *In re Syngenta*, the
> plaintiffs either disavowed a failure-to-warn to claim or asserted that they
> were not alleging that the EPA-approved label was insufficient.
> Nevertheless, the courts in both cases went on to examine those claims and
> found, in conclusory fashion, that they were preempted. And, the third case,
> *Wilgus*, followed *Smith* without much additional analysis.

*See also Beyond Pesticides v. Monsanto Co*., 311 F. Supp. 3d 82, 93 n.4 (D.D.C. 2018)

(collecting cases).

As plaintiffs point out, many cases have held failure-to-warn claims are not pre-

empted by FIFRA where the state law is narrower or the same as FIFRA. *See, e.g.*,

*Hardeman v. Monsanto Co.*, 216 F. Supp. 3d 1037, 1038 (N.D. Cal. 2016); *Hernandez v.*

*Monsanto Co*., CV 16-1988-DMG (EX), 2016 WL 6822311, at *5 (C.D. Cal. July 12,

2016); *Sheppard v. Monsanto Co*., 16-00043 JMS-RLP, 2016 WL 3629074, at *7 (D.

Haw. June 29, 2016); *Adams v. United States*, 622 F. Supp. 2d 996, 1010 (D. Idaho 2009)

("DuPont does not compare plaintiffs' state law claims with FIFRA's provisions and

identify differences. Indeed, the Court's own examination shows that plaintiffs' claims

appear to track FIFRA by alleging that the labels omit necessary warnings, do not contain

adequate instructions, and are misleading.").

In an attempt to distinguish those cases, Monsanto argues that plaintiffs' claims

here invoke state requirements that are broader than FIFRA. Monsanto first criticizes the

plaintiffs' allegations that "none of the labels contain instruction for use that would, if followed, prevent harm to the environment and susceptible, non-resistant plants and crops including soybeans." These requirements, Monsanto argues, are more stringent than FIFRA, which requires that "the label contain instructions that, if followed, would 'prevent <u>unreasonable</u> adverse effects on the environment.'" (Emphasis added.) Although the allegation Monsanto cites appears in plaintiffs' Missouri 2017 Negligent Training count (Count 56), the Court agrees that such an allegation—by omitting the word "unreasonable"—appears to set forth a more stringent rule than FIFRA. That aspect of plaintiffs' claim, then, and to the extent that plaintiffs intend for that term to be a part of their failure to warn claim, is preempted.

Monsanto's other complaints about over-broad allegations are all the more problematic. In any event, the briefing on these points is insufficient to allow this Court to make specific rulings. Suffice it to say plaintiffs will not be allowed to submit failure to warn labeling claims that exceed the parameters of FIFRA.

### 2. Preemption of Consumer Protection Act Claims

It is unlawful under the Nebraska Consumer Protection Act and the Illinois Consumer Fraud Act to engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Plaintiffs allege that defendants engaged in numerous deceptive acts or practices and deceptive advertising and marketing. Monsanto argues these claims are also preempted by FIFRA because the claims would impose labeling requirements not equivalent to those imposed by FIFRA.

39

FIFRA does not preempt these claims for two reasons. First, plaintiffs' claims do not mention labels or labeling. The claims under these acts are focused on "deceptive and/or unfair acts or practices in connection with their design, development, acceleration, marketing, promotion, and commercialization of the [Xtend Crop System]." As explained in the section above, to be preempted, a state law must set forth "a requirement for labeling or packaging." *Bates*, 544 U.S. at 443-44 (internal quotation omitted).

Second, to the extent these claims do somehow involve labels or labeling, similar statutes condemning misleading statements have been found consistent with and not preempted by FIFRA because FIFRA defines "misbranding" as "any statement ... which is false or misleading in any particular," 7 U.S.C. § 136(q)(1)(A), and the state acts merely prohibit such false or misleading practices. *See Beyond Pesticides v. Monsanto Co.*, 311 F. Supp. 3d 82, 91–92 (D.D.C. 2018); *Blitz v. Monsanto Co.*, 317 F. Supp. 3d 1042, 1049 (W.D. Wisc. 2018); *Martin v. Monsanto Co.*, EDCV162168JFW-SPX, 2017 WL 659014, at *4 (C.D. Cal. Feb. 16, 2017). These consumer protection acts are not preempted to the extent they seek to be no more restrictive than FIFRA with respect to labeling.

### B.    Consumer Fraud Act Regulatory Safe Harbor

The Court will dismiss the Nebraska Consumer Protection Act ("NCPA") claim pursuant to its regulatory safe harbor provision. Both the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") and the NCPA exempt from their coverage the transactions authorized by laws administered by United States regulators. 815 ILCS 505/10b(1); Neb. Rev. Stat. Ann. § 59-1617. The ICFA safe harbor provision states

> Nothing in this Act shall apply to any of the following: (1) Actions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States.

815 Ill. Comp. Stat. Ann. 505/10b.

"The Illinois statute itself protects companies from liability if their actions are authorized by federal law." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 942 (7th Cir. 2001)). In *Bober*, for example, plaintiffs filed ICFA claims against a pharmaceutical manufacturer on the grounds that the company provided consumers with false and misleading information about the suitability of two drugs. *Id.* at 937. The Seventh Circuit held that because the defendant pharmaceutical company's "statements fall within the boundaries established by federal law,…they are entitled to protection under section 10(b)(1)." *Id.* at 943. But it is not enough in Illinois that a defendant is regulated by an agency: "the conduct at issue must be specifically authorized." *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 249 (2005); *see also Hage v. Gen. Serv. Bureau*, 306 F. Supp. 2d 883, 890 (D. Neb. 2003).

Here, the alleged conduct involves deceptive and unfair manner in which sales and marketing occurred. Defendants argue that their advertising statements are "authorized by federal law" because they are regulated as part of EPA registration procedures. FIFRA provides that a person may not "distribute or sell" a "registered pesticide if any claims made for it as a part of its distribution or sale substantially differ from any claims made for it as part of the statement required in connection with its registration." 7 U.S.C. § 136j(a)(1)(B). Regardless, "exemption is not available for statements that manage to be

in technical compliance with federal regulations, but which are so misleading or deceptive in context that federal law itself might not regard them as adequate." *Bober*, 246 F.3d at 941. The Court finds that plaintiffs' ICFA claim is thus not exempted by the statute.

> The Nebraska act's exemption is stated more broadly:
>
> the Consumer Protection Act shall not apply to actions or transactions otherwise permitted, prohibited, or regulated under laws administered by the Director of Insurance, the Public Service Commission, the Federal Energy Regulatory Commission, or any other regulatory body or officer acting under statutory authority of this state or the United States.

Neb. Rev. Stat. Ann. § 59-1617. Unlike the Illinois statute, which required that "the conduct at issue must be specifically authorized," *Price*, 219 Ill. 2d at 249, the Nebraska statute exempts claims based on actions merely if they are "regulated" by federal agencies such as the EPA. FIFRA's implementing regulations state "EPA interprets these provisions [7 U.S.C. § 136j(a)(1)(A) and (B)] as extending to advertisements in any advertising medium to which pesticide users or the general public have access." 40 C.F.R. § 168.22(a). The Nebraska plaintiff's claims undoubtedly relate to advertising, which is regulated by the EPA under FIFRA. In light of the broad exemption set forth in the NCPA, the Court must dismiss plaintiff's claims under that statute.

## C. Illinois Consumer Protection Act Claims

### 1. Standing

The ICFA allows actions by "any person who suffers actual damages as a result of a violation of the Act." 815 ILCS 505/10a. Some courts have interpreted the Act as, true to its name, requiring that the plaintiff be a consumer of a good or service. *Steinberg v.*

*Chicago Med. Sch.*, 69 Ill. 2d 320, 328 (1977) (holding medical school applicant was not a consumer and thus ICFA was inapplicable). More recently, Illinois courts have observed that non-consumers "may sue under the ICFA if they allege (and ultimately prove) the nexus between the objectionable conduct and the consumer injury or harm." *Patel v. Zillow, Inc.*, 17 C 4008, 2018 WL 2096453, at *8 (N.D. Ill. May 7, 2018) (collecting cases). That said, "Illinois courts are skeptical of business-v.-business ICFA claims when neither party is actually a consumer in the transaction." *Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 823 (7th Cir. 2018). Non-consumer plaintiffs are thus required to satisfy a "consumer nexus" test. *Id.* Under that test, a con-consumer has standing to sue under the ICFA where the "conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *Bank One Milwaukee v. Sanchez*, 336 Ill. App. 3d 319, 322 (Ill. App. 2003) (citing *Downers Grove Volkswagen, Inc.*, 190 Ill.App.3d 524, 534 (Ill App. 1989) and *Pain Prevention Lab. Inc. v. Electronic Waveform Labs, Inc.*, 657 F. Supp. 1486, 1493 (N.D. Ill. 1987)). Plaintiffs allege unfair and deceptive conduct—the publishing of false information to cause farmers to defensively buy dicamba-resistant seed—that implicates consumer protection concerns. The Court holds plaintiff has adequately alleged standing to sue under the ICFA.

### 2. Federal Rule of Civil Procedure 9(b)

ICFA claims must comply with the "heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b)." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014) Defendant Monsanto, but not BASF, thus argues that the

Illinois plaintiff must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Such a pleading "ordinarily requires describing the who, what, when, where, and how of the fraud." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (internal quotations omitted).

Plaintiffs disagree. They say their consumer protection statute claims are grounded in unfair practice, not fraud. "Because neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b)." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Services, Inc.*, 536 F.3d 663, 670 (7th Cir. 2008). Further, to the extent plaintiffs' claims do sound in fraud, they argue that they have alleged extensive detail regarding defendants' actions, including deceptive conduct, which is incorporated into the ICFA claim. Although Monsanto suggests plaintiffs needed to allege the who, what, where, when, and how of dicamba spraying activity required in a fraud claim, the "fraud" was not the spraying, but was instead Monsanto's advertising and marketing communications. Plaintiffs do allege the form and content of defendants' allegedly fraudulent communications, their timing, their source, and why they were misleading.

Plaintiffs have adequately pleaded their ICFA claim.

## IX.    Negligent Training

Defendants next turn to plaintiffs' claims that defendants failed to provide adequate instructions and training through labels or otherwise. Plaintiffs raise these

claims in six states:  Arkansas, Illinois, Kansas, Missouri (2016 and 2017), South Dakota, and Tennessee (Counts 8, 20, 30, 48, 56, 77, and 89).

Defendants contend that no court has ever recognized a negligent training claim outside the employment context.  Indeed, negligent training claims generally are not recognized outside the employer/employee context.  *Stanley v. ConocoPhillips Pipe Line Co.*, 451 F. Supp. 2d 1286, 1290 (D. Kan. 2006).  The *Stanley* court also rejected that plaintiff's duty to train theory as duplicative of "duty to warn."  *Id.* at 1290.  Plaintiffs insist that negligent training claims are recognized in the relevant jurisdictions, but each of their cited cases pertain to the employer/employee context.  Plaintiffs' claims include defendants' failure to train their own employees and agents, however, so those claims survive defendants' motions to dismiss.

As for the training of non-employee/agents, plaintiffs argue that defendants voluntarily undertook to educate and train users of the Xtend Crop System, and as such they were obliged to exercise due care in carrying it out. *See Wilson v. Rebsamen Ins., Inc.*, 330 Ark. 687, 695 (1997) (citing *Restatement(Second) of Torts* § 324A).  Defendants respond that the complaint does not allege any sort of "voluntary undertaking" theory.  Furthermore, this Court would be the first, apparently, to find an "assumed" duty to train a non-employee/agent.  None of plaintiffs' cited cases involved training or education by a manufacturer regarding the use of its products.  The cognizable claim in this situation is duty to warn.  *See Stanley v. ConocoPhillips Pipe Line Co*., 451 F. Supp. 2d 1286, 1290 (D. Kan. 2006) (holding no duty to train claim allowed by invitee and that such claim "is no different from the duty to warn because a warning may include

such education").  The negligent training claims will be dismissed to the extent they claim defendants failed to train non-employee/agents.

## X.    Breach of Warranties

Plaintiffs raise multiple warranty claims—breach of express warranty in Arkansas, Kansas, Nebraska, South Dakota, and Tennessee (Counts 11, 33, 66, 80, and 92), and breach of the implied warranties of fitness and merchantability in Arkansas, Kansas, Mississippi, South Dakota, and Tennessee (Counts 9, 10, 31, 32, 39, 40, 78, 79, 90, and 91).

### A.    Kansas Breach of Warranties

Under Kansas law, a third party who did not purchase the product at issue can recover for breach of warranty only if the third party (1) is "expected to use, consume or be affected by the goods," and (2) "is injured in person by breach of the warranty."  Kan. Stat. Ann. § 84-2-318.  Defendants therefore argue that Kansas plaintiffs, as non-purchasers of defendants' products who were not injured "in person," cannot maintain claims for breach of any warranty.  Plaintiffs counter that they were "affected by the goods" and that they experienced physical damages (as opposed to purely economic loss) due to breach of the warranty.  However, property damage is not an "injur[y] in person." *See Full Faith Church of Love W., Inc. v. Hoover Treated Wood Products, Inc.*, 224 F. Supp. 2d 1285, 1292 (D. Kan. 2002); *Owens–Corning Fiberglas v. Sonic Dev. Corp.*, 546 F. Supp. 533 (D. Kan. 1982).  In *Full Faith Church*, the plaintiff building owner sued manufacturers of fire retardant that allegedly damaged the building's roof; because the injury was roof damage and not physical injury, the court dismissed the implied warranty

claims.  224 F. Supp. 2d at 1292.  Because Kansas law does not recognize breach of

warranty claims by a third party unless "personal injury" is involved, Counts 31-33 are

dismissed.[10]

### B.      Breach of Implied Warranties in Arkansas, South Dakota, and Tennessee

XtendiMax and Engenia product labels included disclaimers, in bolded all-caps

print.  Monsanto's XtendiMax disclaimer states

TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, NO OTHER
EXPRESS WARANTY OR IMPLIED WARRANTY OF FITNESS FOR
PARTICULAR PUPORSE OR MERCHANTABILITY IS MADE

BASF's Engenia label states

TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, BASF
MAKES NO OTHER EXPRESS OR IMPLIED WARRANTY OF
FITNESS OR MERCHANTABILITY OR ANY OTHER EXPRESS OR
IMPLIED WARRANTY.

Arkansas, South Dakota, and Tennessee each recognize disclaimers of implied warranties

of fitness and merchantability as long as the disclaimer is in writing and conspicuous.

Ark. Code Ann. § 4-2-316; S.D. Codified Laws § 57A-2-316; Tenn. Code Ann. § 47-2-

316.  Thus, defendants argue that their conspicuously-written disclaimers are valid and

prohibit plaintiffs' implied warranty claims.

Plaintiffs do not contest that the Engenia and XtendiMax product labels are part of

the pleadings and therefore subject to consideration on a motion to dismiss.  But plaintiffs

---

[10]  Plaintiffs rely on *Chandler v. Anchor Serum Co*., 198 Kan. 571, 579–80 (1967), because it allowed a third-party warranty claim for damage to farm animals.  *Chandler*, however, predates enactment of § 84-2-318 and was dependent on  a common-law rule that privity is not required in cases involving food fit for human consumption. *See Prof'l Lens Plan, Inc. v. Polaris Leasing Corp*., 234 Kan. 742, 753 (1984).

argue that the warranty disclaimers do not apply because, as non-purchasers, plaintiffs could not have read the disclaimers. Privity between the manufacturer and non-purchasers, however, is not required for the warranties to be effective against non-purchasers. *Hunter v. Texas Instruments, Inc.*, 798 F.2d 299, 302 (8th Cir. 1986) (Arkansas); *see also Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, 3:08-0368, 2009 WL 2983035, at *7 (M.D. Tenn. Sept. 14, 2009).[11] Defendants disclaimed warranties as permitted under UCC § 2-316 and applicable state laws, and to give the non-purchasing plaintiffs more rights than purchasers themselves would have is an untenable result. Furthermore, it is altogether unclear how plaintiffs could be considered users of the product at all and would have standing to bring such a claim. Once again, the Court declines to extend the law as plaintiffs suggest.

Next plaintiffs argue that the Magnuson-Moss Warranty Act, 15 U.S.C. § 2308(a), prohibits disclaimer of implied warranties when an express warranty is provided. That act, however, applies only to consumer products, which are defined as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes." 15 U.S.C. § 2301(1). Federal

---

[11] Plaintiffs' authority, *Wright v. Dow Chem. U.S.A.*, 845 F. Supp. 503, 511 (M.D. Tenn. 1993), is distinguishable. In *Wright*, homeowners sued the manufacturer of a pesticide that an exterminator had sprayed in the homeowner plaintiffs' house. The district court held that the implied warranty of merchantability could not be disclaimed as to plaintiffs, who were the "ultimate consumers" of the product, because plaintiffs never saw the product labels on which the disclaimers were made. *Id.* Here, the plaintiffs—although alleged to be third-party victims—were not the "ultimate consumers" of the defendants' products.

regulations further provide that the act does not apply to "[a]gricultural products…used in the business or occupation of farming." 16 C.F.R. 700.1(b).

Plaintiffs' implied warranty claims in Arkansas, South Dakota, and Tennessee will be dismissed.

## XI.    Design Defect

Plaintiffs bring strict-liability and negligent design defect claims against both defendants in Arkansas, Illinois, Kansas, Missouri (both 2016 and 2017), Nebraska, South Dakota, and Tennessee. As part of their strict liability – design defect claim, plaintiffs allege that defendants "designed, manufactured, distributed, marketed, promoted, and sold the dicamba-resistant trait and seed containing [the dicamba-resistant seed] trait for the express and intended purpose of in-crop use of dicamba herbicide as an integrated crop system." Further, they allege the "Xtend Crop System was and is unsafe for the anticipated, foreseeable use by Xtend Crop System users of spraying dicamba herbicide over the top of crops grown from seed containing the dicamba-resistant trait in summer months and foreseeable in the vicinity of susceptible non-dicamba resistant plants and crops including soybeans." Monsanto—but not BASF—has moved to dismiss both the strict liability and negligent design defect claims.

Monsanto argues that the design defects claim fail as a matter of law because dicamba-resistance is an intended feature of the product. As a result, Monsanto says, plaintiffs are challenging the product, not its design. In support, Monsanto cites cases in which plaintiffs complain not about a design, but about the product itself—e.g., in an Illinois handgun case, the "plaintiffs complain[ed] not of the product's particular design,

but of the product itself," which was a small, concealable handgun. *Riordan v. Int'l Armament Corp.*, 132 Ill. App. 3d 642, 651 (Ill. Ct. App. 1985). The Court disagrees that plaintiffs' claim challenges the fact of the dicamba-resistant trait. Rather, they allege the crop system was ill-designed in that the use of dicamba over-the-top of the seed necessarily resulted in harm to other, non-resistant crops.

Monsanto's motion on this point will be denied.

## XII. Missouri Crop Protection Act

Plaintiffs claim defendants are liable to them for violations of the Missouri Crop Protection Act, which provides that a person "commits the offense of prohibited acts involving crops if…he or she…[i]ntentionally causes the loss of any crop." § 569.132.2(1). That section goes on to state that "Any person who has been damaged by a violation of this section shall have a cause of action under section 537.353." § 569.132.4. Then, § 537.353 states that "any person or entity who knowingly damages or destroys any field crop product that is grown for personal or commercial purposes…shall be liable for double damages pursuant to this section." § 537.353.1 RSMo. Negligent damage to field crops also entitles the victim to compensatory damages under the Act. § 537.353.2. RSMo.

Monsanto, but not BASF, moves to dismiss these counts. Monsanto argues plaintiffs have not alleged that Monsanto knowingly damaged or destroyed any of the Missouri plaintiffs' crops, as required by § 537.353.1. Plaintiffs clearly allege, however, that Monsanto and BASF "did cause loss of and damage to field crops…knowingly and intentionally for the purpose of escalating purchases of dicamba-resistant seed and

50

herbicide for their own financial gain." Plaintiffs also allege that, "[a]t minimum,

Monsanto and BASF negligently damaged field crops" and are thus liable for

compensatory damages.

Monsanto's motion is denied on this point.

## XIII.  Duty and Proximate Cause for Missouri 2016 Claim

Finally, BASF argues that the Court must dismiss plaintiff Franks's Missouri 2016

claims because it already held, in *Bader Farms*, that negligence and strict liability claims

premised on 2016 damages cannot proceed because BASF did not sell the seed that was

released without its corresponding herbicide.  *Bader Farms, Inc. v. Monsanto Co.*, No.

1:16cv299, 2018 WL 1784394, at *5 (E.D.Mo. April 14, 2018) (the "April 14 Order").

This Court did hold, however, that

> BASF could be liable for Monsanto's acts that caused damage in 2015 and
> 2016 <u>if</u> Monsanto <u>intentionally</u> did those acts in furtherance of the
> conspiracy to create an "ecological disaster."

*Id.* (emphasis in original).  At least, therefore, the conspiracy and trespass counts

survived against BASF for 2016.

Moreover, unlike the *Bader Farms* complaint, the Master Crop Damage

Complaint alleges joint venture and/or agency theories in addition to the conspiracy

theory.  Joint venturers "are jointly and severally liable for torts committed within the

scope of the venture."  *Johnson v. Pac. Intermountain Exp. Co.*, 662 S.W.2d 237, 241-42

(Mo. *banc* 1983); *see also Pritchett v. Kimberling Cove, Inc.*, 568 F.2d 570, 580 (8th Cir.

1977) ("when the negligence of a member of a joint enterprise (acting within the scope of

the enterprise) causes harm to a third person, such negligence is imputed to all other members, who become mutually liable").

BASF responds that plaintiffs' joint venture allegations are bare legal conclusions not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 680. This Court disagrees. Plaintiffs allege ample facts to support their joint venture theory, including relationships with researchers and agreements to share profits. Plaintiffs have thus alleged that Monsanto and BASF are liable for any torts committed during their joint venture or agency relationship.

Monsanto, for its part, also seeks dismissal of Franks's 2016 claims based on lack of duty and proximate cause. It again argues that this Court should reconsider its May 8, 2018 decision in *Landers*. *See In re Dicamba Herbicides Litig.*, 2018 WL 2117633, at *2 ("The fact that Monsanto did not manufacture, distribute, or sell the old dicamba herbicide that actually caused the [2016] damage is irrelevant—it is not part of the causal link under plaintiffs' theory of the claim."). For the reasons expressed in Section I, *supra*, the Court declines Monsanto's invitation and denies the motion to dismiss on this point.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Monsanto's motion to dismiss (#146) and defendant BASF's motion to dismiss (#147) are GRANTED in part and DENIED in part.

**IT IS FURTHER ORDERED** that Count 1's nationwide class action claims against defendant BASF are DISMISSED.

**IT IS FURTHER ORDERED** that Strict Liability - Ultrahazardous Activity Counts (Counts 2, 14, 25, 37, 50, 60, 71, and 84) are DISMISSED.

**IT IS FURTHER ORDERED** that plaintiffs' Trespass Counts (Counts 12, 21, 34, 49, 57, 67, 81, 93) are DISMISSED.

**IT IS FURTHER ORDERED** that plaintiffs' Nuisance Counts (Counts 22, 35, 41, 68, and 82) are DISMISSED.

**IT IS FURTHER ORDERED** that the motion to dismiss plaintiffs' Conspiracy Counts is DENIED in part as those Counts relate to underlying intentional torts, and this Court withholds ruling on the Conspiracy Counts based on underlying negligence claims.

**IT IS FURTHER ORDERED** that plaintiffs' Failure to Warn Counts regarding labeling are dismissed only to the extent they exceed the parameters of FIFRA, as explained in the Memorandum.

**IT IS FURTHER ORDERED** that plaintiffs' Nebraska Consumer Protection Act claim (Count 69) is DISMISSED.

**IT IS FURTHER ORDERED** that plaintiffs' Negligent Training claims are DISMISSED to the extent they do not relate to the training of defendants' employees or agents.

**IT IS FURTHER ORDERED** that plaintiffs' Kansas warranty-related counts (Counts 31, 32, and 33) are DISMISSED.

**IT IS FURTHER ORDERED** that plaintiffs' Breach of Implied Warranty Counts in Arkansas, South Dakota, and Tennessee (Counts 9, 10, 78, 79, 90, and 91) are DISMISSED.

Dated this 6th day of February, 2019.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE